616604

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA | )<br>: SS | IN CIRCUIT COURT |
| COUNTY OF LINCOLN | ) | SECOND JUDICIAL CIRCUIT |

---

JEFF NAAKTGEBOREN,

Plaintiff,

vs.

VERMEER EQUIPMENT OF SOUTH
DAKOTA, INC., a Nebraska Corporation,
KEVIN KLEIN, and TOMI KLEIN,

Defendants.

41CIV. 16 – _____

**SUMMONS**

---

THE STATE OF SOUTH DAKOTA SENDS GREETINGS TO THE ABOVE-NAMED
DEFENDANTS:

YOU ARE HEREBY SUMMONED AND REQUIRED to answer the Complaint of the
Plaintiff herein, a copy of which is hereto attached and herewith served upon you, and to serve a
copy of your Answer thereto upon the subscriber at their law office in the City of Sioux Falls,
South Dakota, within thirty (30) days after the completed service of this Summons upon you,
exclusive of the day of such service and, if you fail to answer as above required, judgment by
default may be rendered against you as demanded in the Complaint.

Dated this 23 day of Sep , 2016.

**JOHNSON, JANKLOW, ABDALLAH,
REITER, & PARSONS, L.L.P.**

BY _____
Andrew R. Damgaard
Post Office Box 2348
101 South Main Avenue, Suite 100
Sioux Falls, SD 57101-2348
(605) 338-4304
Email: andy@janklowabdallah.com

*Attorneys for Plaintiff*

**EXHIBIT**

tabbies

1

1

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
| | : SS | |
| COUNTY OF LINCOLN | ) | SECOND JUDICIAL CIRCUIT |

---

JEFF NAAKTGEBOREN,                                      41CIV. 16 – _____

              Plaintiff,            **COMPLAINT AND DEMAND FOR**
**JURY TRIAL**

vs.

VERMEER EQUIPMENT OF SOUTH
DAKOTA, INC., a Nebraska Corporation,
KEVIN KLEIN, and TOMI KLEIN,

              Defendants.

---

The Plaintiff, Jeffrey W. Naaktgeboren ("Naaktgeboren"), through his undersigned

attorney, states and alleges as follows in support of his Complaint against the Defendants:

### PARTIES

1.     Naaktgeboren is a resident of Sioux Falls, Minnehaha County, South Dakota.

2.     The Defendant, Vermeer Equipment of South Dakota, Inc. ("Vermeer of South

Dakota") is a closely held corporation organized under the laws of Nebraska that owns stores and

transacts business at 27108 470th Avenue in Tea, South Dakota. Vermeer of South Dakota also

owns and operates a store in Box Elder, South Dakota.

3.     Defendant Kevin Klein ("Mr. Klein") is the majority shareholder and President of

Vermeer of South Dakota. Klein was serving in those capacities when the acts and omissions

giving rise to this action occurred.

4.     Defendant Tomi Klein ("Mrs. Klein") was a shareholder of Vermeer of South

Dakota when the facts giving rise to this action occurred and continues to be a shareholder at the

present time.

1

## JURISDICTION & VENUE

5.      Jurisdiction over Defendant Vermeer of South Dakota is proper because it has owned and operated stores in South Dakota, had continuous and systematic business transactions in South Dakota for many years, and is registered with the South Dakota Secretary of State to do business in South Dakota.

6.      Jurisdiction over Mr. Klein and Mrs. Klein is proper because they are officers and shareholders of Vermeer of South Dakota, have had systematic and continuous business transactions in South Dakota, made and taken trips to South Dakota related to their duties as officers and shareholders of Vermeer of South Dakota.

7.      Venue in this County is appropriate with respect to Defendant Vermeer of South Dakota as Vermeer of South Dakota has a store in Tea, South Dakota and a substantial amount of the acts and omissions giving rise to this action occurred in Tea, South Dakota.

8.      Venue is appropriate with respect to Defendants Mr. and Mrs. Klein because they are residents of Nebraska and, as a result, are subject to suit in any county.

## FACTS

9.      In 1999, Naaktgeboren was working as the store manager for a Vermeer store in Burnsville, MN.

10.     Naaktgeboren had worked at that store for approximately fifteen (15) years.

11.     The Burnsville store was an established store with an established customer base and approximately fifteen (15) employees.

12.     Defendant Mr. Klein had franchise rights for Vermeer stores in South Dakota.

13.     In 1999, Vermeer of South Dakota was operating a store in Box Elder and a store located at 47066 98th Street in Sioux Falls, South Dakota, which is just northeast of the Tea exit on Interstate ninety (90).

14.     Vermeer of South Dakota sells and services heavy equipment.

15.     In 1999, the Sioux Falls location, however was in its infancy, had only two employees, very little inventory, and rented a small building.

16.     The Box Elder store was up and running in 1999.

17.     Mr. Klein called Naaktgeboren on several occasions and asked him to accept the position of manager of Vermeer of South Dakota.

18.     Naaktgeboren declined however because the salary offered was approximately half of what he was earning at the Burnsville store, the Sioux Falls store was in its infancy, and it would require Naaktgeboren and his family to relocate.

19.     Mr. Klein subsequently offered Naaktgeboren incentive pay in addition to a base salary and an opportunity to purchase fifteen percent (15%) of the shares in Vermeer of South Dakota.

20.     Naaktgeboren accepted the offer and in February of 1999, Naaktgeboren executed an Employment Agreement outlining his salary, incentive pay, and providing that he could only be terminated "for cause."   A true and correct copy of the Employment Agreement is attached as **Exhibit A**.

21.     In August of 1999, Naaktgeboren executed a Stock Restriction Agreement as part of his purchase of fifteen thousand (15,000) shares in Vermeer of South Dakota.   A true and correct copy of the Stock Restrictive Agreement is attached hereto as **Exhibit B**.

22.     As manager of the Sioux Falls store, Naaktgeboren expanded its inventory, grew its customer base, and increased the number of employees.

23.     The store also relocated to Tea, South Dakota and built a building large enough to accommodate the increase in business and employees.

24.     Naaktgeboren traveled to Box Elder approximately twice per month and stayed several days during each trip to oversee that store's operations.

25.     In July of 2016, Naaktgeboren had been managing Vermeer of South Dakota seventeen and one half (17 ½ years).

26.     The company had ten employees and did millions of dollars in sales annually.

27.     The book valued shareholder's equity in Vermeer of South Dakota nearly tripled during Naaktgeboren's tenure.

28.     The market value of Vermeer of South Dakota is significantly higher than its book value.

29.     On Friday, July 15, 2016 during the lunch hour, Defendant Kevin Klein and his two sons Joe and Dusty, walked into Naaktgeboren's office.

30.     Naaktgeboren did not recall a single instance in his tenure as manager that Defendant Mr. Klein and his two sons ever visited the Tea location together.

31.     Neither Joe nor Dusty Klein were employees or shareholders of Vermeer of South Dakota.

32.     Instead, Joe and Dusty Klein work at Vermeer stores in Nebraska that are owned by a separate entity and controlled by their father.

33.     The three of them asked Naaktgeboren to meet with them in Naaktgeboren's office.

34.     Once in the office Defendant Mr. Klein read from his cellular phone that Mr. Naaktgeboren had done something "detrimental to the corporation."

35.     Neither Defendant Klein nor his sons, however, would explain to Naaktgeboren any specific allegations detrimental conduct or any facts to support those allegations.

36.     Instead, Defendant Klein continued to repeat that Naaktgeboren had done something "detrimental to the corporation."

4

37.     The circumstance of this encounter and Defendant Mr. Klein refusing to specify what Naaktgeboren did that was detrimental led Naaktgeboren to believe his only choice was to resign or be terminated.

38.     Defendant Mr. Klein made Naaktgeboren put his belongings in a box and then drove Mr. Naaktgeboren home in his company truck.

39.     On August 15, 2016, Vermeer of South Dakota's attorney informed Naaktgeboren that the corporation was redeeming his shares pursuant to the Stock Restriction Agreement.

40.     Vermeer of South Dakota, however, did not provide Naaktgeboren the proposed purchase price for his shares until two weeks prior to the closing date.

41.     Vermeer of South Dakota's accountant valued the shareholder equity on a tax basis method of accounting despite the fact that the Stock Restrictive Agreement provides that book value be determined by generally accepted accounting principles.

42.     Vermeer of South Dakota's accountant wrote that the financial statement was a compilation and "therefore ha[s] not been certified, as would be the case of audited financial statements."

43.     The Stock Restrictive Agreement defines book value in part as the "total Stockholder's equity as shown on the financial statement *certified* by the independent public accountants employed by the corporation...."

44.     If Naaktgeboren refused to close, Defendant Mr. Klein would have transferred Naaktgeboren's shares to the corporation pursuant to the Stock Restrictive Agreement.

45.     Naaktgeboren closed the stock repurchase after indicating to the corporation, through his counsel, that he disagreed with the valuation and reserved all rights and claims he had against the shareholders and the corporation.

46.     Naaktgeboren is fifty-eight years old and is currently unemployed.

47.     Almost all of Naaktgeboren's work history is related to the sale of heavy equipment or managing stores that sell and service heavy equipment.

48.     Vermeer of South Dakota is intent on holding Naaktgeboren to a covenant not to compete that, if enforceable, would prevent Naaktgeboren from having any association with any "heavy equipment dealer, distributor or manufacturer" within the states of South Dakota, Nebraska, or Wyoming for a period of three years.

### Count 1—Breach Of Stock Restrictive Agreement

49.     Paragraphs 1 through 48 are incorporated herein as if set forth in full.

50.     The Stock Restrictive Agreement provides that book value in the event of the corporation's repurchase of stock be determined by generally accepted accounting principles and that the financial statement on which the stockholder's equity is documented be certified by the accountant.

51.     Vermeer of South Dakota determined the value of the stockholder equity using the tax basis of accounting, which included depreciation that would not have been included had the value been determined by generally accepted accounting principles.

52.     The financial statement reflecting the shareholder's equity was not certified and Vermeer of South Dakota's accountant did not "express an opinion, a conclusion, nor provide any form of assurance" on the financial statement.

53.     Vermeer of South Dakota omitted all of the disclosures ordinarily included in financial statements that are prepared with the tax basis of accounting.

54.     Had Vermeer of South Dakota included such disclosures, its accountant believed the disclosures "might influence the user's conclusions about the Company's assets, liabilities, stockholder's equity and operations."

55.     The failure to value the stockholder equity in accordance with the Stock Restrictive Agreement is a material breach of that agreement.

56.     Naaktgeboren has been damaged as a result of Vermeer of South Dakota's breach in an amount to be determined at trial.

### Count 2- Breach of Fiduciary Duties

57.     Paragraphs 1 through 56 are incorporated herein as if set forth in full.

58.     Vermeer of South Dakota is a closely held corporation and, as such, the shareholders owe one another fiduciary duties.

59.     Mr. and Mrs. Klein breached their fiduciary duties to Naaktgeboren by forcing him out of the corporation, threatening to transfer his shares if he refused to close, and paying him less than what his shares were worth.

60.     As a direct and proximate result of Mr. and Mrs. Klein's breaches, Naaktgeboren has been damaged in an amount to be determined at trial.

### Count 3—Wrongful Discharge/Breach of Employment Agreement

61.     Paragraphs 1 through 60 are incorporated herein as if set forth in full.

62.     The Employment Agreement provides that Naaktgeboren could only be terminated for cause.

63.     Naaktgeboren did not engage in "serious misconduct" or make any other act or omission that justified for cause termination.

64.     Naaktgeboren was not provided with a resolution adopted by the Board of directors indicating it had cause to terminate him prior to forcing him to resign.

65.     A document signed by Mr. Klein, which was not provided to Naaktgeboren prior to him being forced to resign, provides that Naaktgeboren's only choice was to resign or have his employment contract terminated.

7

66.     Naaktgeboren was at work on July 15, 2016 and willing to perform his duties under the Employment Agreement.

67.     Vermeer of South Dakota's refusal to permit Naaktgeboren an opportunity to perform his duties constitutes a constructive discharge, which was wrongful and a material breach of the Employment Agreement.

68.     As a direct and proximate result of the wrongful discharge and breach of the Employment Agreement, Naaktgeboren was deprived his salary and incentive pay from August until February 28, 2017, which he would have been entitled to had Vermeer of South Dakota elected not to renew the Employment Agreement as opposed to wrongfully discharging Naaktgeboren.

### Count 4- Declaratory Judgment on Covenant Not to Compete

69.     Paragraphs 1 through 68 are incorporated herein as if set forth in full.

70.     The covenant to compete in the Employment Agreement restricts Naaktgeboren from associating or being connected with distributors and manufacturers of heavy equipment.

71.     Vermeer of South Dakota has never been a distributor or a manufacturer, but a dealer that sells and services heavy equipment.

72.     Vermeer has never competed with manufacturers or distributors.

73.     The covenant not to compete also restricts Naaktgeboren from being associated or connected with anyone in the heavy equipment industry in Nebraska.

74.     Naaktgeboren, however, never worked for or was associated with the Vermeer stores in Nebraska and it was very infrequent that Vermeer of South Dakota did business with customers from Nebraska.

8

75.    The covenant not to compete would also prevent Naaktgeboren from working in essentially the only field in which he has expertise after he was wrongfully discharged at fifty-eight years of age.

76.    This Court should declare the covenant not to compete invalid and unenforceable as it is greater than reasonably necessary to protect Vermeer of South Dakota and unduly harsh.

**WHEREFORE**, Plaintiff Jeffrey W. Naaktgeboren respectfully prays for the following relief:

(1) For a judgments on counts 1, 2, and 3 awarding Naaktgeboren monetary damages;

(2) For allowable interest on the damages and costs, disbursements, and attorney's fees;

(3) For judgment from the Court on count 4 declaring the covenant not to compete unenforceable;

(4) For such further relief the Court deems just.

Dated this 2 3 day of Sep, 2016.

**JOHNSON, JANKLOW, ABDALLAH,
REITER, & PARSONS, L.L.P.**

By _____

Andrew R. Damgaard
Post Office Box 2348
101 South Main Avenue, Suite 100
Sioux Falls, SD 57101-2348
(605) 338-4304
Email: andy@janklowabdallah.com

*Attorneys for Plaintiff*

## Demand for Jury Trial

Naaktgeboren demands a jury trial on all issues triable to a jury.

Dated this 2 3 day of Sep, 2016.

_____

# Exhibit A

*Employment Agreement*

# EMPLOYMENT AGREEMENT

THIS AGREEMENT is made between Vermeer Equipment of South Dakota, Inc., a Nebraska corporation ("Vermeer"), with its principal place of business at 47066 98th Street, Sioux Falls, South Dakota 57108, and Jeff Naaktgeboren ("Naaktgeboren")

WHEREAS, Vermeer and Naaktgeboren desire to enter into an employment relationship by means of this Employment Agreement.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is mutually covenanted and agreed by and between the parties as follows:

1.      Employment. Subject to final approval by the Vermeer Board of Directors, Vermeer hereby employs Naaktgeboren and Naaktgeboren hereby accepts employment upon the terms and conditions contained herein.

2.      Term. The initial term of this Agreement shall begin on or before March 1, 1999, and shall continue until the last day of February, 2000; provided, however, the term shall be automatically renewed for successive one (1) year increments if neither Vermeer nor Naaktgeboren notify the other party at least ninety (90) days in advance of the last day of February of the then current term that the Agreement should not be renewed  Notice of nonrenewal shall not be a termination as contemplated by Section 7 hereafter  All of the terms, provisions and conditions contained in this Agreement shall remain in full force and effect for each succeeding term

3.      Duties  During the term of this Agreement, Naaktgeboren will be employed as Vice President and General Manager of Vermeer and, in addition, in such other capacity or capacities for Vermeer as may be determined from time to time by or under the authority of the Board of Directors, President or Chief Executive Officer of Vermeer, and he shall devote all of his skill, knowledge and full working time (reasonable vacation time and absence for illness, sickness or other similar disability excepted) solely and exclusively to the conscience performance of such duties.

Naaktgeboren will not, during the term of this Agreement, directly or indirectly, engage in any business, either as an employee, employer, consultant, principal, corporate officer, or in any other capacity, whether or not compensated, without the prior written consent of Vermeer.

Naaktgeboren hereby represents that his employment hereunder and compliance by him with the terms and conditions of this Agreement will not conflict with or result in the breach of any

agreement to which he is a party or by which he is bound. Naaktgeboren will have the powers of a General Manager and Vice President subject to control of the Board of Directors, and have general supervision, direction and control over the business and affairs of Vermeer and its employees. Naaktgeboren will be primarily responsible for carrying out all orders and resolutions of the Board of Directors and such duties as may from time to time be assigned to Naaktgeboren by the Board of Directors.

In absence of the Chairman of the Board at any shareholders' or Board of Directors' meeting, Naaktgeboren will preside over that shareholders' meeting and, in the event Naaktgeboren is then a director of Vermeer, will preside over the Board of Directors' meeting

4.     Compensation. Naaktgeboren will receive compensation during the term of this Agreement as follows:

A.     As compensation for the duties to be performed by Naaktgeboren hereunder, Vermeer will pay Naaktgeboren at a base salary of Fifty Thousand Dollars ($50,000 00) per year during the initial Term  The base rate will be paid bi-monthly and in succeeding Terms shall be subject to review from time to time during the period of Naaktgeboren's employment and, at the discretion of the President of Vermeer in consultation with the Board of Directors of Vermeer, may increase his base compensation from time to time based upon his performance, then current prevailing industry compensation scales, and other relevant factors

B.     Naaktgeboren shall be entitled to an incentive compensation payment in respect to each full fiscal year of Vermeer which commences within the employment period beginning with the fiscal year which commences January 1, 1999, in an amount equal to ten percent (10%) of the net income (as hereinafter defined) of Vermeer for such fiscal year. Such incentive compensation shall be paid within forty-five (45) days of receipt by Vermeer of financial statements certified by the independent public accountants at the time employed by Vermeer for the fiscal year in respect of which such additional incentive compensation is payable. The amount of additional incentive compensation in respect to any fiscal year shall be prorated if the employment period does not cover a full fiscal year

For the purposes of this provision, the "net income" of Vermeer for any fiscal year shall mean the amount remaining after deduction from gross revenues (other than sales of capital assets)

all normal costs and expense deductions determined in accordance with generally accepted accounting principles applied on a consistent basis for financial statement purposes for an "S" corporation.  For purposes of this section, the fiscal year of Vermeer means the annual period for which Vermeer files its federal income tax returns.

5.   Expenses. Vermeer shall reimburse Naaktgeboren for reasonable travel, lodging and meal expenses incurred by him in connection with his performance of services hereunder upon submission by him of evidence, satisfactory to Vermeer of the incurrence and purpose of each such expense. Submittal of documentation with regard to such expense shall comply with Vermeer's corporate policy in regard thereto.

6.   Benefit. Naaktgeboren shall be entitled to all benefits comparable to those benefits currently provided to other employees of Vermeer or as the Board of Directors of Vermeer, in its sole discretion, shall decide.

7   Termination. Naaktgeboren's employment hereunder shall automatically terminate upon his death or "disability" (as hereinafter defined), and Vermeer may terminate Naaktgeboren's employment during any given Term for "cause" (as hereinafter defined).  For purposes of this Agreement, "disability" shall mean the inability, due to physical or mental ill health, or for any reason beyond the control of Naaktgeboren, to perform Naaktgeboren's duties for thirty (30) consecutive days, or for an aggregate of sixty (60) days during any one employment year irrespective of whether such days are consecutive. For purposes of this Agreement, Vermeer shall have "cause" to terminate Naaktgeboren's employment hereunder upon (i) the willful failure of Naaktgeboren to substantially perform his duties and continuance of such failure for more than ten (10) days after Vermeer notifies Naaktgeboren in writing that he is failing to substantially perform his duties; (ii) the engaging by Naaktgeboren in serious misconduct which is injurious to Vermeer; (iii) the conviction of Naaktgeboren in a court of proper jurisdiction of a crime which constitutes a felony; or (iv) a breach of any term, condition, agreement, representation or provision of this Agreement.  Notwithstanding the foregoing, Naaktgeboren shall not be deemed to have been terminated for "cause" unless and until there shall be delivered to him a copy of a resolution, duly adopted by the Board of Directors of Vermeer, finding that Vermeer has "cause" to terminate Naaktgeboren as contemplated by this section.

Naaktgeboren may terminate his employment hereunder by giving one hundred twenty (120) days' written "notice of termination" to the President of Vermeer.

Any termination by Vermeer or Naaktgeboren shall be communicated by a "written notice of termination" (as hereinafter defined) to the other party to this Agreement. For purposes of this Agreement, a "notice of termination" shall mean a notice which shall indicate the specific termination provisions in this Agreement relied upon and shall set forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of employment.

In the event employment is terminated by either party, Naaktgeboren will be entitled to only base salary compensation earned prior to the date of termination computed pro rata up to and including the date of termination. Naaktgeboren shall not receive the incentive salary payments provided for elsewhere herein.

8. <u>Confidential Information</u>. Naaktgeboren acknowledges that he will be in a position in which he shall be entrusted with or will obtain access to confidential and proprietary information about the organization, management and business plans, practices and policies of Vermeer, together with confidential customer lists, trade secrets, and other information considered confidential and proprietary by Vermeer. Naaktgeboren agrees that the secrecy of this information is of value to Vermeer's business.

Naaktgeboren agrees that it is reasonable and necessary for the protection of the good will and business of Vermeer and as a material consideration for his employment with Vermeer that Naaktgeboren make the covenants contained in Paragraphs 9, 10, 11 and 12 about Naaktgeboren's conduct during and after his employment and that Vermeer will suffer irreparable injury if Naaktgeboren engages in the prohibited conduct. Naaktgeboren has thoroughly reviewed the terms of these covenants, including the time periods, and Naaktgeboren's experience and abilities are such that observing such covenants will not cause Naaktgeboren undue hardship nor will it unreasonably interfere with Naaktgeboren's ability to earn a livelihood. The covenants are each separate obligations independent of any other provisions of this Agreement, and the existence of any claim or cause of action of Naaktgeboren against Vermeer is not a defense to the enforcement by Vermeer of any such covenants.

9. <u>Nondisclosure of Confidential Information</u>.

A    During or after Naaktgeboren's employment with Vermeer, Naaktgeboren shall not for any reason whatsoever, either directly or indirectly, communicate or divulge to any other person or entity, or use for the benefit of Naaktgeboren or any other person or entity, Naaktgeboren's compensation package including salary, bonus and net

profit figures and percentages, or any of Vermeer's trade secrets, confidential information, or other proprietary information, including but not limited to the items described in Paragraph 8 hereof or information of any kind or nature pertaining to the business, practices or policies of Vermeer without the express prior written consent of Vermeer.

B.    Naaktgeboren shall maintain the confidentiality of this Agreement and shall not discuss or reveal to any third party its terms or conditions without Vermeer's prior written consent.

10    <u>Noncompete During Term of Employment</u>. In consideration of Vermeer employing Naaktgeboren and because of the inherently demanding nature of the management of the business, Naaktgeboren agrees that during the term of his employment, for whatever reason or cause, Naaktgeboren hereby agrees as follows:

A.    Naaktgeboren shall not engage in any business on a full-time basis or a part-time basis if the latter precludes him from actively and effectively performing the services under this Employment Agreement; and

B.    He shall not on his own behalf or on behalf of any other person, partnership, association or corporation solicit or in any manner attempt to influence or induce any employee of Vermeer to leave its employment, and

C.    That the restrictions contained herein are fair and reasonable and are reasonably required for the protection of the interests of Vermeer because of the access to certain confidential information of a special and unique nature and value relating to such matters as Vermeer's trade secrets, systems, procedures, confidential reports, client lists, as well as the nature and type of processes and other services rendered by Vermeer.

11    <u>Noncompetition Following Termination</u>   For a period of three (3) years following the termination of Naaktgeboren's employment with Vermeer for any reason whatsoever, Naaktgeboren shall not directly or indirectly engage in or operate, own, manage, control, join or participate in the ownership, management, operation or control, or consult with respect to or otherwise be connected or associated with any heavy equipment dealer, distributor or manufacturer within the states of South Dakota, Nebraska, Wyoming and ~~Minnesota~~. _KrK_

Additionally, Naaktgeboren shall not on his own behalf or on behalf of any other person, partnership, association or corporation, solicit or in any manner attempt to influence or induce any employee of Vermeer to leave its employment for a period of three (3) years after the termination of this Agreement or Naaktgeboren's employment with Vermeer for any reason whatsoever.

12.     Good Will Retention.  In further consideration of this Agreement and Vermeer offering employment to Naaktgeboren as provided for hereunder, and in recognition that Vermeer is engaged in a service business involving confidential information and personal relationship with customers, the success of which business is in large part due to the exclusive retention of such confidential information and undisturbed continuation of such personal relationships with customers, Naaktgeboren does hereby covenant, agree and acknowledge that the following covenants are reasonably necessary for the protection of Vermeer and its good will and may be enforced to such extent as any court of competent jurisdiction may deem reasonable and proper:

A       Naaktgeboren agrees that he shall not, directly or indirectly, on his own behalf or on behalf of anyone else, make use of the information contained in Paragraph 8 herein, nor divulge such information to anyone nor retain or create any list of Vermeer's customers for his own personal use nor reveal the same to anyone.

B.      Naaktgeboren hereby further covenants and agrees that for a period of three (3) years after the termination of this Agreement or his employment with Vermeer he shall not, directly or indirectly, solicit, attempt to obtain or accept orders from any of Vermeer's customers, nor act in the capacity of an advisor or consultant to said customers, nor directly or indirectly aid or assist anyone else in the solicitation of Vermeer's customers.

13.     Remedies for Breach of Agreement or Nonperformance.  Notwithstanding the ability to terminate this Agreement and Naaktgeboren's employment as a result of Naaktgeboren's violation of any term or condition of this Agreement, Vermeer shall be entitled to injunctions, both preliminary and final, enjoining and restraining such violation or breach of this Agreement.  Such remedy shall be in addition to all other remedies available at law or in equity including Vermeer's right to recover from Naaktgeboren any and all damages that may be sustained as a result of Naaktgeboren's breach of this Agreement.

14      Indemnification.  Vermeer agrees that it shall indemnify Naaktgeboren to the fullest extent permitted by applicable law.

15.     Notices. All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given if delivered personally or sent by certified mail, return receipt requested, postage prepaid, to the parties to this Agreement at the following addresses or to such other address as either party to this Agreement shall specify by notice to the other:

| | |
|---|---|
| If to Vermeer, at: | 5700 N. 70th Street<br>Lincoln, NE 68507<br>Attn: Kevin Klein |
| If to Jeff Naaktgeboren, at: | 47066 98th Street<br>Sioux Falls, SD 57108 |

All notices and communications shall be deemed to have been received on the date of delivery or on the third business day after the mailing thereof.

16.     Entire Agreement. No provisions of this Agreement may be modified, waived or discharged unless such modification, waiver or discharge is approved by the Board of Directors of Vermeer or a person authorized thereby and is agreed to in a writing signed by Naaktgeboren and such officer as may be specifically designated by the Board. No waiver by either party hereto at any time of any breach by the other party hereto of or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreements or representations, oral or otherwise, expressed or implied, with respect to the subject matter hereof, have been made by either party which are not set forth expressly in this Agreement. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the state of Nebraska, and Lancaster County, Nebraska shall be the proper venue for any litigation arising out of this Agreement.

17.     Validity. The invalidity or unenforceability of any one or more provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

18.     Paragraph Headings. Paragraph headings are for convenience only and are not intended to expand or restrict the scope of substance of the provisions of this Agreement.

19.     Assignability. The rights and obligations of Vermeer under this Agreement shall inure to the benefit of and be binding upon the successors and assigns of Vermeer. This Agreement

is a personal employment agreement and the rights, obligations and interests of Naaktgeboren hereunder may not be sold, assigned, transferred, pledged or hypothecated.

20.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.


EMPLOYEE:

_Jeff Naaktgeboren_ _____
Jeff Naaktgeboren


VERMEER EQUIPMENT OF
SOUTH DAKOTA, INC ,
A Nebraska Corporation


BY _____
TITLE: _____


APPROVED BY THE BOARD OF DIRECTORS OF VERMEER EQUIPMENT OF SOUTH DAKOTA, INC. BY PROPER RESOLUTION ON THE _15_ DAY OF _February_, 19_97_.


_____
Secretary of Vermeer

# Exhibit B

*Stock Restrictive Agreement*

## STOCK RESTRICTION AGREEMENT

THIS AGREEMENT is made this _1_ day of _March_, 1999, by and between Jeff Naaktgeboren ("Stockholder") and Vermeer Equipment of South Dakota, Inc , a Nebraska corporation ("Corporation")

### RECITALS PROVISION

A       The parties hereto believe it is desirable and in their mutual best interests to control the ownership of the common stock of Vermeer Equipment of South Dakota, Inc and that the execution of this Agreement will help facilitate the continuous, harmonious and effective management of the affairs, policies and operations of the Corporation.

B       It is the intention of the parties to restrict the transfer of shares of common stock of the Corporation held by Stockholder, and to provide a market for the sale of such shares upon the occurrence of certain events as provided in this Agreement

C       Stockholder is a key member of the Corporation and the Corporation recognizes that the loss of the services of any of Stockholder would constitute a serious impairment to the effective conduct of its business

D       The parties to this Agreement believe that its execution will serve as an inducement to Stockholder to remain with the Corporation

NOW, THEREFORE, in consideration of the matters set forth in the Recitals Provision and the mutual covenants, promises, agreements, representations and warranties of the parties hereto, the parties hereto do hereby covenant, promise, agree, represent and warrant as follows:

1.       DEFINITIONS   Capitalized words and phrases used in this Agreement shall have the following meanings

1.1       "Accountants" means the independent certified public accountants examining the books and accounts of the Corporation at the relevant times, if there be none, then the independent certified public accountants who last performed such services for the Corporation

1 2       "Act" means the Securities Act of 1933, as amended

1 3       "Agreement" means this Stock Restriction Agreement, as amended from time to time

1.4       "Book Value" shall mean the total Stockholder's equity as shown on the financial statement certified by the independent public accountants employed by the Corporation determined in accordance with generally accepted accounting principles applied on a consistent basis for financial statement purposes for an "S" corporation divided by the number of shares of common stock issued and outstanding at the time of the calculation.

1 5       "Closing" means any and all closing dates as set forth in this Agreement whether it be for the sale, transfer or assignment due to death, disability, voluntary, involuntary or termination of employment transfer.

1 6       "Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provision of any succeeding law)

1 7       "Common Stock" means the authorized shares of voting common stock of Vermeer Equipment of South Dakota, Inc

1 8       "Corporation" means Vermeer Equipment of South Dakota, Inc , a Nebraska corporation.

1.9       "Days" means all calendar days, inclusive of Sundays, Saturdays, and days which are legal holidays under the laws of the United States or the state of Nebraska.

1 10       "Disability" means the first to occur of

1 10 1       A Stockholder being declared legally incompetent under the laws of the State, in which event the date of the Disability shall be deemed to be the date of such declaration

1.10 2       The Corporation receiving a written opinion from a physician designated by the Corporation to the effect that a Stockholder has incurred a mental or physical condition that can reasonably be expected to prevent such Stockholder from carrying out the Stockholder's material duties for the Corporation for a period of one hundred twenty (120) days or longer from the date of such opinion, in which event the date of the Disability shall be deemed to be the date of the physician's written opinion, each Stockholder hereby covenants and agrees to cooperate with any physician so designated by the Corporation to determine whether such Stockholder has suffered a Disability, provided that any physician so designated shall consult with any physician designated by, or on behalf of, such Stockholder

1.10 3       The Corporation receiving a payment under any Disability Policy with respect to a Stockholder, in which event the date of the Disability shall be deemed to be the date on which the Stockholder was first deemed disabled pursuant to the Disability Policy.

1.10.4     A Stockholder being deemed disabled under the provision of the Social Security Act, 42 USC § 416 42, USCS § 416, in which event the date of the Disability shall be deemed to be the first date on which the Stockholder satisfied the requirements contained therein

1.11      "Disability Policy" means any disability insurance policy insuring against the Disability of a Stockholder

1 12      "Event of Bankruptcy" means with respect to any Stockholder, any of the following

1.12.1     Filing a voluntary petition in bankruptcy or for reorganization or for the adoption of an arrangement under the Bankruptcy Code (as now or in the future amended) or an admission seeking the relief therein provided

1.12.2     Making a general assignment for the benefit of creditors.

1.12 3     Consenting to the appointment of a receiver for all or substantially all of a Stockholder's property

1 12 4     In the case of the filing of an involuntary petition in bankruptcy, an entry of an order for relief

1 12 5     The entry of a court order appointing a receiver or trustee for all or a substantial part of a Stockholder's property, without the Stockholder's consent.

1.12.6     The assumption of custody or sequestration by a court of competent jurisdiction of all or substantially all of a Stockholder's property

1 13      "Involuntary Transfer" means any nonvolitional Transfer of Common Stock whatsoever and shall be deemed to occur if·

1.13.1     A Stockholder is subject to an Event of Bankruptcy

1 13 2     A Stockholder's shares of Common Stock are to be transferred pursuant to, (i) divorce or separation decree, property settlement, or any other form of judicially approved marital arrangement, (ii) the foreclosure of any lien or other security interest, (iii) a judicial sale; or (iv) otherwise by operation of law

1 14      "Person" means any individual, partnership, corporation, trust or other entity

1 15      "Security" has the meaning set forth in the Act

1.16      "State" means the state of Nebraska.

1.17      "State Acts" means the securities laws of any state, or the District of Columbia

1.18      "Stockholder" means a Person owning of record the Common Stock and executing this Agreement or a counterpart thereof

1 19      "Transfer" means, when used as a noun, any sale, hypothecation, pledge, assignment or other transfer, be it voluntary or involuntary, to a Stockholder or third person, inter vivos, testamentary, by operation of the laws of devise and descent or any other laws, and, when used as a verb, to voluntarily or involuntarily, to a Stockholder or third person, inter vivos, testamentary, by operation of the laws of devise and descent or any other laws, sell, hypothecate, pledge, assign or otherwise transfer,

1.20      "Terminated Stockholder" means a Stockholder who is no longer employed by the Corporation as a consequence other than by reason of death or disability

1 21      "Voluntary Transfer" means any transfer of Common Stock other than an involuntary transfer

2         RECITAL PROVISIONS; RESTRICTIONS ON TRANSFER·

2 1       The matters set forth in the Recital Provisions are incorporated by reference herein, and made a substantive part of, this Agreement.

2 2       Each Stockholder covenants, promises and agrees that he shall not transfer all, any portion of, or any interest or rights in, the shares of Common Stock owned of record or beneficially by such Stockholder except pursuant to the terms and provisions of this Agreement. Each Stockholder hereby acknowledges the reasonableness of the restrictions on transfers imposed by this Agreement in view of the purposes of the Corporation and the relationships of the Stockholders

2 3       Strict compliance shall be required with each and every provision of this Agreement and particularly with the procedures set forth herein with respect to any transfer of any shares of Common Stock. It is understood and agreed by the parties hereto that no Stockholder shall have the right or power to transfer any shares of Common Stock except in strict compliance with the procedures set forth in this Agreement. The transfer of any shares of Common Stock by any Stockholder shall be deemed invalid, null and void, and of no force or effect, and the transferee of any such shares shall not be entitled to vote such shares, receive dividends on such shares, or have any other rights in and with respect to such shares unless such transfer is made in conformance with and pursuant to the terms of this Agreement.

3      DEATH OF A STOCKHOLDER.

3 1      Upon the death of a Stockholder (the "Decedent"), the Corporation shall purchase, and the Decedent's personal representative shall sell, all of the shares of Common Stock owned of record and beneficially by the Decedent at the time of the Decedent's death (the "Decedent Shares")  The Corporation shall, by written notice addressed to the personal representatives of the Decedent, fix a closing date (the "Decedent Closing Date") for such purchase  The Decedent Closing Date shall be neither earlier than ten (10) days after the appointment of the personal representatives nor later than one hundred fifty (150) days after the date of death of the Decedent.  The Corporation shall purchase the Decedent's Shares on the Decedent Closing Date at a price per share (the "Decedent Purchase Price") which shall be equal to Book Value

4.      VOLUNTARY TRANSFER OF STOCK

4 1      A Stockholder (individually, a "Transferor") shall be permitted to Voluntarily Transfer all of the shares of Common Stock owned of record and beneficially by the Transferor (the "Transferor Shares") to any other Person (a "Transferee"), pursuant to a bona fide written offer (the "Transferee Offer") by such Transferee to purchase all, but not less than all, of the Transferor Shares for a purchase price denominated and payable in United States dollars, subject to the provisions of this Section 4.

4 2      Prior to any Voluntary Transfer of the Transferor Shares, the Transferor shall first give the Corporation written notice (the "Transfer Notice").  The Transfer Notice shall contain each of the following

4.2.1      The identity of the Transferee.

4 2 2      A true, correct and complete copy of the Transferee Offer

4.2.3      An offer (the "Offer") by the Transferor to sell the Transferor Shares to the Corporation for a price per share (the "Transfer Purchase Price") equal to the lesser of Book Value or the per share price contained in the Transferee Offer

4 3      The Offer shall be and remain irrevocable for a period (the "Offer Period") ending at 11 59 P.M , local time at the Corporation's principal office, on the 30th day following the date the Transfer Notice was received by the Corporation.  At any time during the Offer Period, the Corporation may accept the Offer by giving written notice of such acceptance (the "Offeree Notice")  In the event that the Offer is accepted by the Corporation, the Offeree Notice shall fix a closing date (the "Transfer Closing Date") for such purchase which shall be neither earlier than ten (10) days nor later than ninety (90) days after the expiration of the Offer Period

4 4      In the event that the Offer is accepted by the Corporation, the dollar amount of the Transfer Purchase Price multiplied by the number of Transferor Shares (the "Aggregate Transfer Purchase Price") shall be paid in cash on the Transfer Closing Date

4 5      If the Corporation shall reject the Offer or fail to accept the Offer (within the time and in the manner specified in this Section 4), then the Transferor shall be free for a period (the "Free Transfer Period") of thirty (30) days from the expiration of the Offer Period to Transfer the Transferor Shares to the Transferee, for the same or greater price and on the same terms and conditions as set forth in the Transfer Notice.  Such transfer shall be, (i) subject to any additional restrictions on transfers that may be imposed by this Agreement, by any other agreement between all of the parties hereto, by statute, law, ordinance, rule or regulation or by the Articles or By-Laws of the Corporation; (ii) permitted, provided that the purchase of the Transferor Shares will not result in the imposition of a personal holding company tax or other similar federal or state punitive tax on the Corporation; and (iii) permitted, provided that the Transferee and, if the Transferee is married the spouse of the Transferee, shall execute, seal and deliver a document substantially in the form of Exhibit 4 5 attached hereto (the additional requirements as set forth in clauses (i)-(iii) of this sentence are referred to collectively as the "Additional Restrictions")  If the Transferor does not transfer the Transferor Shares within the Free Transfer Period, the Transferor's right to transfer the Transferor Shares pursuant to this Section 4 shall cease and terminate

4.6      Any transfer by a Transferor after the last day of the Free Transfer Period or made without strict compliance with the terms, provisions and conditions of this Section 4 and the other terms, provisions and conditions of this Agreement shall be null and void

4 7      In the event that the Corporation elects to accept the Offer and the Transferor should die or become an Involuntary Transferor, a Disabled Stockholder, or a Terminated Stockholder prior to the Transfer Closing Date, the provisions of this Section 4 shall be and remain operative, and the provisions of Sections 3, 5, 6, 7 or 8, as the case may be, shall be inapplicable.

4.8      Notwithstanding the provisions of this Section 4 to the contrary, but provided that each of the Additional Restrictions is complied with, any Stockholder may at any time, and from time to time, transfer all or any portion of the shares of Common Stock owned by such Stockholder to any other Stockholder

5.      INVOLUNTARY TRANSFER OF STOCK

5 1      In the event of an Involuntary Transfer of any shares of Common Stock owned of record or beneficially by any Stockholder (the "Involuntary Transferor Shares") and the "Involuntary Transferor"), the Corporation shall have the option (the "Involuntary Transfer Purchase Option") to purchase all, but not less than all, of the Involuntary Transfer Shares for a price per share (the "Involuntary Transfer Purchase Price") equal to Book Value

5 2      The Involuntary Transfer Purchase Option shall be and remain irrevocable for a period (the "Involuntary Transfer Period") ending at 11:59 P.M., local time at the Corporation's principal office on the 30th day following the date of the Corporation's

receipt of notice (the "Involuntary Transfer Notice") from the Involuntary Transferor or any Person acquiring or to acquire any interest in the Involuntary Transfer Shares (the "Involuntary Transferee"). At the earliest practicable opportunity, the Involuntary Transferor covenants and agrees to furnish the Involuntary Transfer Notice to the Corporation or cause the Involuntary Transfer Notice to be furnished to the Corporation. The Involuntary Transfer Notice shall set forth the nature and terms of the Involuntary Transfer, the number of shares of Common Stock involved therein, and shall identify the Involuntary Transferee.

5 3      At any time during the Involuntary Transfer Period, the Remaining Stockholders may elect to exercise the Involuntary Transfer Purchase Option by giving written notice of their election to the Involuntary Transferor and the Involuntary Transferee

5 4      In the event that the Corporation elects to exercise the Involuntary Transfer Purchase Option, the Corporation's notice of such election shall fix a closing date (the "Involuntary Transfer Closing Date") for such purchase which shall be not earlier than five (5) days after the date of such notice of election, nor later than thirty (30) days after the expiration of the Involuntary Transfer Period

5 5      In the event that the Corporation elects to exercise the Involuntary Transfer Purchase Option, the dollar amount of the Involuntary Transfer Purchase Price multiplied by the number of Involuntary Transferor Shares (the "Aggregate Involuntary Transfer Purchase Price") shall be paid in cash on the Involuntary Transfer Closing Date

5 6      If the Corporation fails to exercise the Involuntary Transfer Purchase Option, the Involuntary Transfer Shares may be Involuntarily Transferred free and clear of this Agreement

5 7      In the event that the Corporation elects to exercise the Involuntary Transfer Purchase Option and the Involuntary Transferor should die or become a Transferor, a Disabled Stockholder, or a Terminated Stockholder prior to the Involuntary Transfer Closing Date, the provisions of this Section 5 shall be and remain operative, and the provisions of Sections 3, 4, 6, 7 or 8, as the case may be, shall be inapplicable

6      DISABILITY OF A STOCKHOLDER

6.1      Provided that a Stockholder shall not have terminated full-time employment with the Corporation for any reason other than Disability, upon the Disability of a Stockholder (the "Disabled Stockholder") the Corporation shall purchase, and the Disabled Stockholder shall sell, all of the shares of Common Stock owned of record and beneficially by the Disabled Stockholder at the time of the Disability (the "Disability Shares"). The Corporation shall, by written notice addressed to the Disabled Stockholder, fix a closing date (the "Disability Closing Date") for such purchase which shall be neither earlier than ten (10) days nor later than thirty (30) days after the date of the Disability. The Disability Shares shall be purchased by the Corporation on the Disability Closing Date at a price per share in accordance with this Section 6

6.2      The Corporation shall purchase the Disability Shares at a price per share (the "Disability Purchase Price") which shall be equal to the Book Value

6 3      In the event that the Disabled Stockholder should die or become a Transferor, an Involuntary Transferor, or a Terminated Stockholder after the date the Disability occurred but prior to the Disability Closing Date, the provisions of Section 6 shall be and remain operative, and the provisions of Sections 3, 4, 5, 7 or 8, as the case may be, shall be inapplicable

7      TERMINATION OF EMPLOYMENT OF A STOCKHOLDER AS TRANSFER

7.1      Immediately upon termination of employment with the Corporation, the Terminated Stockholder shall sell, and the Corporation shall purchase, all of the shares of Common Stock owned of record and beneficially by the Terminated Stockholder at the time of the Termination (the "Termination Shares"). The Corporation shall, by written notice addressed to the Terminated Stockholder, fix a closing date (the "Termination Closing Date") for such purchase which shall be neither earlier than ten (10) days nor later than ninety (90) days after the Termination

7.2      The Corporation shall purchase the Termination Shares at a price per share (the "Termination Purchase Price") which shall be equal to the Book Value

7 3      The dollar amount of the Termination Purchase Price multiplied by the number of Termination Shares (the "Aggregate Termination Purchase Price") shall be paid in cash on the Termination Closing Date.

7.4      In the event that the Terminated Stockholder should die or become a Transferor, an Involuntary Transferor, or a Disabled Stockholder prior to the Termination Closing Date, the provisions of Section 7 shall be and remain operative, and the provisions of Sections 3, 4, 5, 6 and 8, as the case may be, shall be inapplicable

8      DELIVERY OF CERTIFICATES

8.1      All Closings shall take place at the offices of the Corporation. At the Closing, the stock certificate or certificates representing the Shares shall be delivered to the Corporation duly endorsed in blank, and the Corporation shall pay the purchase price therefor in cash.

8 2      If a tender of the purchase price in cash shall be refused, or the stock certificate or certificates representing the Shares, duly executed, as aforesaid, shall not be so delivered, then the President of the Corporation is hereby appointed the attorney-in-fact of the Seller, with full power and authority to execute, seal and deliver the stock certificate or certificates in the Seller's name and stead, and to perform any and all other and further acts desirable, necessary or proper in order to transfer such stock certificate or certificates to the Corporation on the books of the Corporation in accordance with the terms, provisions and conditions of this Agreement.

8 3      The power of attorney granted pursuant to Section 8 2 hereof is a special power of attorney coupled with an interest and is irrevocable and shall survive the death, Disability, legal incapacity, Event of Bankruptcy or Insolvency of a Stockholder

9.      SECURITIES LAWS AND ENDORSEMENTS OF STOCK CERTIFICATES.

9.1      The Stockholders severally acknowledge that the Common Stock acquired by them has not been registered under the Act, or any State Acts.  The Stockholders severally represent and warrant that they acquired their shares of the Common Stock without a view to the offer, offer for sale, or the sale in connection with the distribution of such shares of Common Stock and that they will hold such shares of Common Stock indefinitely unless subsequently registered under the Act and the State Acts or unless an exemption from such registration is available and an opinion of counsel for the Remaining Stockholders, in form and substance satisfactory to the Remaining Stockholders, is obtained to that effect  The provisions of Sections 3, 4, 5, 6, 7 and 8 hereof are in all respects subject to the Act and the State Acts and all regulations promulgated thereunder.  All certificates representing shares of Common Stock subject to this Agreement shall be legend conspicuously in substantially the following form.

"The securities represented by this stock certificate have been issued pursuant to an investment representation on the part of the holder thereof and shall not be sold, pledged, hypothecated, donated, or otherwise transferred, whether or not for consideration, by the holder except upon the issuance to the Corporation of a favorable opinion of its counsel and the submission to the Corporation of such evidence as may be satisfactory to counsel for the Corporation in either case to the effect that any such transfer shall not be in violation of the Securities Act of 1933, as amended, and applicable state securities law "

9 2      Each Stockholder realizes that the Corporation does not file, and does not in the foreseeable future contemplate filing, periodic reports in accordance with the provisions of Sections 13 and 15(d) of the Securities Exchange Act of 1934, as amended, and also understands that the Corporation has not agreed to register any of its securities for distribution in accordance with the provisions of the Act or to take any actions respecting the obtaining of an exemption from registration for such securities or any transaction with respect thereto.  Hence, by virtue of certain rules respecting "restricted securities" promulgated under the Act, the Common Stock acquired by the Stockholders must be held indefinitely unless and until subsequently registered under the Act and/or the State Acts or unless an exemption from such registration is available, in which case the amount of the Common Stock that may be sold may be limited

9 3      Upon the execution of this Agreement, all certificates representing shares of Common Stock owned of record and beneficially by the Stockholders shall be conspicuously legended as follows

"The shares of stock represented by this Certificate are restricted as to transfer by the terms, conditions and covenants of an Agreement with respect thereto dated the ____ day of _____, 19___, a copy of which is on file with the Corporation.  The Corporation will gratuitously furnish a copy of said Agreement to any party having a valid interest therein  Any transfer of stock other than in accordance with said Agreement shall be null and void "

10      AFTER-ACQUIRED STOCK·  Whenever any Stockholder acquires any additional shares of Common Stock other than the shares of Common Stock owned at the time of the execution of this Agreement, such shares of Common Stock so acquired shall be subject to the terms of this Agreement, and the certificates therefor shall be surrendered to the Corporation for legending in accordance with Section 9 hereof, unless already so legended

11      TERMINATION  This Agreement shall be perpetual until the happening of any of the events listed below, upon the first to occur of which all rights, duties and obligations, other than the duties and obligations relating to registration under or exemption from the Act and the State Acts, as set forth in Section 9 hereof

11 1      The agreement in writing of all holders of the outstanding shares of Common Stock who are parties to, or who are bound by, this Agreement to terminate this Agreement

11.2      The dissolution of the Corporation

11 3      The receipt by the Corporation from the Securities and Exchange Commission of an order of effectiveness as to any registration statement for the sale of any capital stock of the Corporation under the Act, whether or not such capital stock is owned by any of the Stockholders

11 4      In the event that there shall be only one (1) owner of issued and outstanding shares of Common Stock of the Corporation

11 5      In the event that there is a merger, consolidation or share exchange whereby the Corporation is not the surviving or successor corporation, as the case may be.

12      AGREEMENT DRAFTED BY REMAINING STOCKHOLDER'S ATTORNEY·  The Stockholder acknowledges and represents that the Corporation's counsel, Jack G. Wolfe, prepared this Agreement on behalf of and in the course of its representation of the Corporation, as directed by the Board of Directors of the Corporation.  Further, the Stockholder severally acknowledges and represents that

12.1      He has been advised that a conflict of interest may exist between his interests and those of the Corporation and the other Stockholders.

12 2      He has been advised by the Corporation's counsel to seek the advice of independent counsel

12 3     He has had the opportunity to seek the advice of independent counsel

12 4     He has been advised by the Corporation's counsel that this Agreement may have tax consequences

12 5     He has received no representations from the Corporation's counsel concerning the tax consequences of this Agreement

12.6     He has been advised by the Corporation's counsel to seek the advice of independent tax counsel

12 7     He has had the opportunity to seek the advice of independent tax counsel

13     NOTICES   Any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be either be.  (a) delivered personally to the party or to an officer of the party to whom it is directed, in which case a signed receipt therefor shall be received, or (b) sent by certified mail, return receipt requested, postage prepaid, to the Corporation or Stockholders, as the case may be, at the addresses set forth below their several signatures, or to such other address or addresses as may be designated from time to time in accordance with this Section 13   Any such notice shall be deemed to be delivered, given and received for all purposes of this Agreement as of   (i) the date noted on the signed receipt if delivered personally, or (ii) the date deposited in a regularly maintained receptacle for the deposit of the United States mail, if sent by certified mail

14     ADDITIONAL ACTIONS AND DOCUMENTS.

14 1     Each of the parties hereto agrees to take or cause to be taken such further actions, to execute, acknowledge, seal and deliver, or cause to be executed, acknowledged, sealed and delivered such further instruments and documents, and to use his reasonable efforts to obtain such requisite consents, as any other party may from time to time reasonably request in order to fully effectuate the purposes and fulfill the intent of this Agreement.

14 2     Any Stockholder who is an officer or director or both of the Corporation and whose stock ownership in the Corporation shall terminate for any reason whatsoever shall resign, effective upon such termination, as such an officer and director, and shall resign as a trustee of any pension or profit sharing plan of the Corporation or any other employee benefit plan of the Corporation of which such Stockholder is a trustee.

15.     CONSENT AND APPROVAL OF SPOUSE.   Each married party to this Agreement agrees to obtain the consent and approval of his spouse, by the execution, sealing and delivery of this Agreement by such spouse, to all the terms, provisions and conditions of this Agreement   Should an unmarried party to this Agreement become married, or should a married party to this Agreement divorce and remarry after the date hereof, such party agrees to obtain the consent and approval of such spouse, by the execution, sealing and delivery of this Agreement by such spouse, to all of the terms, provisions and conditions of this Agreement

16     INSERTION IN WILL   Each Stockholder agrees to insert in his Will a provision, or to execute a Codicil thereto, directing and authorizing the Stockholder's personal representative to fulfill and comply with the terms, provisions and conditions of this Agreement and to sell and transfer the Stockholder's shares of Common Stock in accordance herewith

17.     INSURANCE

17.1     The Stockholders or the Corporation shall have the right to make application for, take out, and maintain in effect Life Policies whenever, and in such amounts as, in the opinion of the Stockholders or the Corporation, may be necessary or desirable to fund a purchase hereunder.

17.2     The Stockholders or the Corporation shall have the right to make application for, take out, and maintain in effect Disability Policies whenever, and in such amounts as, in the opinion of the Stockholders or the Corporation, may be necessary or desirable to fund a purchase hereunder.

17.3     Each Stockholder hereby covenants and agrees to take such other and further actions and execute and deliver such other and further documents necessary to enable the Remaining Stockholders or the Corporation to acquire the Life Policies and the Disability Policies

18     OPTION TO PURCHASE INSURANCE POLICIES   The Seller (or upon the termination of this Agreement in accordance with Section 11 hereof, all of the Stockholders) shall have the option to purchase any life insurance policies on his life (or their lives) owned by the Corporation within ninety (90) days after the Closing (or date of the termination of this Agreement) by tendering to the Corporation in cash, or by certified check, that dollar amount which is equal to the sum of

18 1     The interpolated terminal reserve of each such policy and any paid up additions; plus

18 2     Any dividends or dividend accumulations credited to such policy; plus

18.3     The unearned portion of any premium paid beyond the date the policy is to be transferred, less

18.4     Any indebtedness against such policy and any loan interest accrued thereon as of the date of transfer.

In the event that a Stockholder exercises this option to purchase the life insurance policies, the Corporation shall promptly deliver to such Stockholder the policy or policies together with such written documents as are necessary to convey full title in the policies to the Stockholder.  If the Stockholder does not exercise this purchase option, the Corporation may dispose of or deal with the policy or policies in the manner it desires

19    INTEGRATION   This instrument contains the entire integrated agreement among the parties and supersedes all prior oral or written agreements, commitments or understandings with respect to the matters provided for herein, and no modification shall be binding upon the party affected unless set forth in writing and duly executed by each party affected

20 1    OWNERSHIP OF STOCK   The Stockholder represents and warrants that

20 1    He is the sole owner of the number of shares of Common Stock set forth opposite his signature hereto, evidenced by the certificate number or numbers shown immediately after such number of shares

20 2    All of such shares are free and clear of any and all liens, claims, charges, security interests, or encumbrances of any kind

20 3    He has the full and entire right, power and authority to sell or otherwise transfer such shares in accordance with the terms, provisions and conditions of this Agreement.

21    BINDING EFFECT   Each of the covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of their respective heirs, guardians, personal and legal representatives, successors and permitted assigns.

22    NEBRASKA LAW.   This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the state of Nebraska

23    SPECIFIC PERFORMANCE.   In the event of a breach of this Agreement, any non-breaching party hereto may maintain an action for specific performance against the party or parties hereto who are alleged to have breached any of the terms, conditions, representations, warranties, provisions, covenants or agreements herein contained, and it is hereby further agreed that no objection to the form of action in any proceeding for specific performance of this Agreement may not be obtained by the aggrieved party Anything contained herein to the contrary notwithstanding, this Section 23 shall not be construed to limit in any manner whatsoever any other rights and remedies that an aggrieved party may have by virtue of any breach of this Agreement

24    HEADINGS   The descriptive headings of the several sections and subsections of this Agreement are inserted for convenience only, do not constitute a substantive part of this Agreement, and are not intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement as a whole, or any provision hereof   All schedules and exhibits referred to in this Agreement are hereby deemed a substantive part of this Agreement

25    WORD USAGE   Unless the context otherwise requires, whenever used in this Agreement, the singular shall include the plural, the plural shall include the singular, and the masculine gender shall include the neuter and feminine gender, and vice versa Whenever used in this Agreement, words such as "herein", "hereinafter", "hereof", "hereto", and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires

26    COUNTERPARTS   This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall together constitute one document

27.    CONSTRUCTION.   Each and every term and provision of this Agreement has been mutually agreed to and negotiated by the parties hereto, and shall be construed simply according to its fair meaning and not strictly for or against any party

28    SEVERABILITY   Each and every term and provision of this Agreement is intended to be severable   If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remainder of this Agreement.

29.    TIME   Time is of the essence with respect to all aspects of this Agreement.

30    AMENDMENT.   This Agreement shall only be amended by written document signed by the president of the Corporation after authorization by resolution of the Board of Directors and by holders of 100% of the issued and outstanding shares of Common Stock who are parties to, or who are bound by, this Agreement.

IN WITNESS WHEREOF, the parties hereunto have executed, sealed and delivered this Agreement or caused this Agreement to be executed, sealed and delivered on the day and year first hereinabove set forth

| No of Shares Owned | Stock Certificate No |
|---|---|
| 15,000 | 3 |

_Jeff Naaktgeboren_
Jeff Naaktgeboren - Stockholder

VERMEER EQUIPMENT OF SOUTH DAKOTA, INC ,
A Nebraska Corporation

BY _Kevin E. Klein_
Kevin E Klein, President

### SPOUSAL CONSENT

Each of the undersigned, being the spouse of a Stockholder, hereby acknowledges that she has read and is familiar with the provisions of the Agreement, and agrees to be bound thereby and to join therein to the extent such joinder is necessary   The undersigned hereby agrees that he spouse may join in any future amendment or modification of the Agreement without the need for any future signature, acknowledgment, agreement or consent on her part, and further agrees that any interest which she may have (now or in the future) in the Common Stock owned of record and beneficially by her spouse shall be subject to the terms and provisions of this Agreement

Witnesses                    Signature of Spouse                    Dated

_Joseph M K_    _Barbara a Naaktgeboren_    _8-25-99_